LYNCH MULTIMEDIA
CORPORATION,
Plaintiff,

v.

CARSON COMMUNICATIONS, L.L.C., Robert C. Carson and June M. Carson, Co–Trustees of the Robert C. Carson Trust, and Robert C. Carson, Individually, Defendants.

No. 99–1134–JTM.

United States District Court,
D. Kansas.

June 26, 2000.

Jeff C. Spahn, Jr., Jack Balderson, Jr., Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, Russell A Cook, William A Johnson, Linn & Neville, P.C., Oklahoma City, OK, for Lynch Multimedia Corp.

Robert O. Lesley, Joan K. Rowland, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for Carson Communications LLC, Robert C Carson, June M Carson.

*MEMORANDUM ORDER*

MARTEN, District Judge.

Currently before the court in this action are competing summary judgment motions by plaintiff and defendants. The parties were involved in a joint venture limited liability company (CLR Video). One of the companies (Lynch Multimedia) has sued one of the other member companies, its owners, and its agent, alleging that they breached the operating agreement and various fiduciary duties when they independently acquired other cable fran-

chises, rather than securing them for CLR Video. For the reasons stated herein, the court finds that the motion of the defendants must be granted, and the court finds, under the facts presented here, there was no violation of the operating agreement/fiduciary duties.

## Findings of Fact

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that

there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Although both sides have moved for summary judgment, the key facts are not the subject of significant dispute. CLR Video is a limited liability company organized in Kansas. Its primary place of business is Kansas, where it operates a cable television system.

Under the Operating Agreement of November, 1995, CLR has three owners: Lynch Multimedia, Rainbow Communications and Electronics, and the Robert C. Carson Trust. Lynch owns a 60% interest in CLR; Rainbow and the Carson Trust each own 20%. CLR has a Board of Managers which manage its business; under the Operating Agreement Lynch names three of the managers, and Rainbow and the Carson Trust each name one.[1] Robert C. Carson was the president of CLR. The Operating Agreement gives the president "general and active management" of CLR's business, and carries out orders and resolutions of the Board of Managers. (Operating Agreement, at 4.6).

The two provisions of the Operating Agreement which are central to this case are set forth below:

> *Other Cable Systems.* Any opportunity which comes to the attention of a Member to purchase cable television systems (i) in Kansas from Cablevison of Texas, Tristar Cable, Inc. or Falcon Cablevision; and (ii) in Atchison, Brown, Clay, Cloud, Doniphan, Jackson, Jefferson,

---

1. Lynch appointed Robert Dolan, Robert Hurwich, and Mary Carroll to the Board. Rainbow appointed Gil Crouse. The Carson Trust appointed Robert Carson.

Nemaha, Leavenworth, Marshall, Ottawa, Pottawatomie, Republic, Riley and Washington counties in Kansas shall be first offered to the Company.

(Id. at 11.4).

*Other Interests.* Any Member or Manager may engage independently or with others in other business ventures of every nature and description. Neither the Company nor any Member shall have any right by virtue of this Agreement of the relationship created hereby in or to any other ventures or activities in which any Member or Manager is involved or to the income or proceeds derived therefrom. The pursuit of other ventures and activities by Members or Managers is hereby consented to by the Members and shall not be deemed wrongful or improper.

(Id. at 11.2).

Carson learned in 1996 that Falcon might be for sale. According to plaintiff, at a subsequent meeting of the members in the fall of 1996, the members approved the possible acquisition of Falcon, along with the potential purchase of two other cable systems (Galaxy and Tristar).

After this 1996 meeting, Carson learned that cable systems owned by Westcom (a successor of Tristar) and Galaxy might become available for purchase. Carson was not told that Lynch wasn't interested in pursuing the acquisitions mentioned in Atlanta.

In August or September of 1997, Carson informed Lynch representatives of the Westcom and Galaxy opportunities at a meeting at Lynch Corporation headquarters in Chicago. He also discussed those opportunities at another meeting in Chicago on October 26 and 27. According to Lynch, it encouraged Carson to acquire these companies. Carson objects that "encouragement" is too strong a term, that they merely suggested continued study of the target companies.

Lynch's suggested fact is premised on Carson's own testimony. Carson testified that Lynch's agents told him "let's look at it further, let's explore it further." (Car-

son dep. at 51). The acquisition of Falcon, Westcom, and Galaxy were discussed. Robert Dolan, a Lynch representative, told Carson "It looks good. Let's explore it further." (Id. at 761).

Carson and the plaintiff's representatives met on April 4, 1998 in Greenwich Connecticut. Carson met with Mario Gabelli, a Lynch representative. Again, the members discussed the acquisition of Falcon, Westcom, and Galaxy. By the end of the meeting, no agreement had yet been reached with Falcon, Westcom, or Galaxy about buying their cable systems. During the meeting, according to Carson and another witness, Gabelli expressly rejected the acquisition of the Falcon, Galaxy, and Westcom cable television systems.

Carson and Falcon reached an agreement on the Falcon purchase price in May of 1998. However, Galaxy became unwilling to sell.

In September or October of 1998, Carson, through Carson Communications, L.L.C., and Falcon executed an Asset Purchase Agreement. He executed an Asset Purchase Agreement with Westcom in November of 1998.

On October 7, 1998, Carson wrote to Dolan, proposing two plans for acquiring Falcon and Westcom. On November 11, he sent a term sheet to Gabelli, proposing to acquire Falcon and Westcom. He submitted another term sheet to Dolan on December 30, which proposed the acquisition of Falcon and Westcom properties but which attached terms not contained in the CLR Operating Agreement, and which would require changes in the Operating Agreement. Among the proposed changes was an increase in his salary, continuation as president of CLR, and an increase in the value of his equity interest upon the sale of his interest to other members.

In April or March of 1999, Carson Communications closed on the Westcom and Falcon Asset Purchase Agreements. According to Lynch, its representative Robert Hurwich (a Lynch attorney) previously

had sent a demand that Lynch be allowed to exercise its proportionate ownership interest as provided by the Operating Agreement. Gabelli and Hurwich directed Carson to close on the properties.

**Conclusions of Law**

■ The core of the dispute between the parties lies in the construction of Section 11.4 of the Operating Agreement, and the scope of the duty created by the section's requirement that an "opportunity ... to purchase cable television systems ... shall be first offered to the Company." Carson argues that any duty under 11.4 was met when he notified or told other members of the CLR Video that certain opportunities existed.

Lynch adopts a more narrow definition of "offer," citing the Restatement (Second) of Contracts, § 24 (1981): an offer is a representation which must "justify another person in understanding that his assent to that bargain is invited and will conclude it." (Plf. Resp. at 7). Thus, Lynch argues that Carson could not fulfill the duty created by § 11.4 unless he presented the other members with a no-strings-attached purchase offer at a properly-called special meeting of the members. Carson violated this obligation, according to Lynch, because he sought to add terms to any acquisition of the target companies and because there was no formal meeting informing Carson that he could acquire the companies for his own.

The court finds that this interpretation must be rejected. First, looking just to the plain language of § 11.4, it would appear that the Operating Agreement does not intend the standard legal definition of "offer." Under this provision, the member does not offer an "offer" to the other members in the sense that it could be "accepted" or concluded. The member merely offers knowledge of an "opportunity." The member notifying the other members is not an agent of the target company, and thus could not bind the target company to any contract.

Secondly, Section 11.4 must be read in the context of the entire Operating Agree-ment. As indicated earlier, a separate provision (Section 11.2) in the agreement expressly provides that:

*Other Interests.* Any Member or Manager may engage independently or with others in other business ventures of every nature and description. Neither the Company nor any Member shall have any right by virtue of this Agreement of the relationship created hereby in or to any other ventures or activities in which any Member or Manager is involved or to the income or proceeds derived therefrom. The pursuit of other ventures and activities by Members or Managers is hereby consented to by the Members and shall not be deemed wrongful or improper.

Contrary to the suggestion of Lynch, neither § 11.4 nor 11.2 is the "more specific," and both provisions should be construed together so as to give each meaning. In the context of an Operating Agreement creating a cable television company, formed from other cable television companies, this provision's explicit statement that the members may engage "in other business ventures of *every nature and description* " is plainly directed at permitting the members to enter into separate and additional business relations in the cable television industry.

■ Similarly, Lynch's argument that Carson's notifications in 1996 through 1998 cannot meet the standard set forth by § 11.4 because there were no formal member meetings as set forth in the Operating Agreement must also be rejected. First, § 11.4 is devoid of any explicit requirement that notice of the "opportunity" be conveyed to other members at a formal meeting. Second, Lynch is estopped from invoking the lack of a formal meeting. The uncontroverted facts establish that, with Lynch's acquiescence, CLR Video consistently operated in an informal manner. Although the Operating Agreement requires formal annual meetings, Lynch never attempted to have such a meeting. It never sought to call such a

meeting to respond to Carson's reports about Falcon, Westcom or Galaxy. Rather, Lynch responded to these notices—at times offering "encouragement", at other times rejecting the opportunity—by informal communications (telephone calls, letters) with Carson.

■ Finally, the court will also grant summary judgment as to the general claims of breach of fiduciary duty advanced by Lynch. Lynch never articulates how these claims are distinguishable from the underlying claim of breach of § 11.4 of the Operating Agreement. Under Kansas law, the members of a limited liability company may expand or restrict their duties and liabilities by the terms of their agreement. K.S.A. 17–76,134(c). Although Lynch argues that this statute is inapplicable because it was passed after CLR Video was formed, the Kansas Legislature expressed an intent that from January 1, 2000 the Act "shall be applicable to all limited liability companies formed in Kansas, whether formed before or after such date."

In short, Carson informed the other members of CLR Video of certain opportunities to purchase cable companies. Only after the passage of several months or years, and at one point after the rejection of the proposal, did Carson independently acquire the companies. Under the facts presented to the court, the plaintiff has demonstrated neither a breach of the Operating Agreement nor of the defendants' fiduciary duties.

IT IS ACCORDINGLY ORDERED this 26th day of June, 2000, that the defendants' Motion for Summary Judgment (Dkt. No. 78) is hereby granted.